CHAPMAN *v.* NORTHERN LOGGING CO.

1. Workmen's Compensation—Finding of Department—Loss of Vision—Optic Atrophy—Evidence.

Finding of department that loss of vision of left eye from optic atrophy was due to accidental injury *held,* not sustained by the evidence.

2. SAME—BURDEN OF PROOF.
> Employee, claiming compensation for loss of vision of left eye
> because of accidental injury, *held*, not to have sustained his
> burden of proof that accident was proximate cause.

Appeal from Department of Labor and Industry. Submitted June 5, 1935. (Docket No. 32, Calendar No. 38,282.) Decided September 9, 1935.

Charles Chapman presented his claim against Northern Logging Company, employer, for accidental injuries sustained while in defendant's employ. Award to plaintiff. Defendant appeals. Reversed.

*L. E. Garvin* and *P. H. Garvin,* for plaintiff.

*Derham & Derham,* for defendant.

BUTZEL, J.   Certiorari is brought to review an order of the department of labor and industry awarding plaintiff compensation for the loss of vision in his left eye. Plaintiff claims that on February 17, 1934, as he stepped on a load of logs in the woods, while in the course of his employment as a logger for defendant, something struck him in the left eye and on the front of the head and knocked him unconscious, causing both the eye and nose to bleed. He was able to work for a day or two thereafter and then complained to the foreman, who sent him to a doctor. It is conceded that the loss of vision is due to optic atrophy. As the question has arisen whether there are any facts to support the award, we shall briefly review the testimony. Two days after the alleged injury, plaintiff consulted Dr. Prout, who found two small lacerations in the cornea of the left eye. The following day he consulted Dr. Lieberthal, who removed some foreign particles from the left eye and placed him in a

hospital. After two days this condition cleared. The doctor, however, found that at that time vision in each eye was only 10/200. He found that there was an optic nerve atrophy affecting both eyes but not at all attributable to the presence of the foreign particles that had been removed. He found no bruises on plaintiff, nor did plaintiff complain of any.

In his application for adjustment of claim filed with the department, plaintiff alleged that the injury to the eye was caused "by a splinter from cable, piece of bark or some foreign matter striking claimant in eye and cutting, bruising, lacerating eyeball and injuring optic nerve causing claimant to lose sight of left eye causing blindness in right eye." Four doctors, including the two heretofore mentioned, examined plaintiff. He told them nothing whatever about being struck on the head, or being unconscious, but simply stated that some foreign matter had lodged in the eye. The teamster, foreman and camp clerk all testified that plaintiff had made like statements to them. As the condition later, however, was found to be due to optic atrophy and the doctors agreed that this could only be caused by an extremely severe blow, plaintiff extended the scope of his claim and maintained that he was struck on the head and knocked unconscious. When asked at the time of the hearing: "When did you first develop the story about being hit on the head by a cable?" he replied: "When I filed for this."

"*Q.* You told your attorney and you signed it? Why didn't you put it there that you were hit on the top of the head instead of saying something flew and hit you in the eye?

"*A.* Why didn't I?

"*Q.* Yes.

"*A.* I don't know."

Evidently the department believed plaintiff, notwithstanding much convincing testimony to the contrary. But even after recognizing the legal conclusiveness of the department's finding and making due allowance for inaccuracies in plaintiff's application as to the cause of the injury, he nevertheless cannot recover. The medical testimony all shows that optic atrophy is usually due to constitutional conditions. It can only be caused by an extremely severe head injury. The testimony is also undisputed that optic atrophy cannot develop within a period of but a very few days after a traumatic injury unless it is caused by a very severe head injury such as a skull fracture or gun shot wound. The testimony, however, shows that whatever head injury plaintiff received was not of this nature. His own testimony, viewed in the most favorable light, was that something struck him in the left eye and forehead and knocked him unconscious. None of the physicians who examined him after the injury found any evidence of such a blow. Dr. Lieberthal testified that he neither saw any such bruises nor that plaintiff made any complaint about any head injury; that there was no evidence of it. Dr. Rees testified that it would take quite a severe injury to cause optic atrophy within 10 days, and that his examination of plaintiff on February 25, 1934, eight days after the injury, disclosed no evidence of such a blow. Dr. Prout, who examined plaintiff only two days after the alleged injury, testified that there would be some external indication if there had been a blow severe enough to cause optic atrophy. He found no signs of such a blow. Dr. Hornbogen testified to like effect. He stated that while he found no evidence of any injury to plaintiff's eyes, he made no examination of plaintiff's scalp or skull for the reason that plaintiff complained of no such

injury. He stated that in order for a traumatic injury to cause atrophy of the optic nerve tract in such a brief period, there would have to be a direct fracture, hemorrhage or inflammation. There was no evidence or complaint of any such injury. It thus appears from the undisputed medical testimony that plaintiff did not receive a head injury sufficiently severe to cause optic atrophy within the short space of time claimed by him.

Dr. Paul, however, did testify in plaintiff's favor. He made his examination almost a month after the alleged accident. He took X-rays and the plates which were presented in evidence revealed a dark patch in the region of the temporal lobe. Dr. Paul stated that he was inclined to believe that this was a hemorrhagic blood clot and that if it was a blood tumor, it would be sufficient to cause the loss of plaintiff's eyesight by causing a pressure on the optic nerve if the clot was in or on the optic nerve tract. He admitted, however, that he could not qualify as an interpreter of X-ray pictures; that he could not localize the spot in question and did not know whether it was in or on the optic nerve. He was asked:

"And after an examination of these X-rays and your examination of Charles Chapman and the case history that he gave you, you would say that an injury such as he has could cause this?"

He answered:

"In the absence of any other condition producing an atrophy, I would say it would be due to the injury."

He, however, testified that optic atrophy is usually due to constitutional conditions; that he made no examination whatever to determine whether such

constitutional conditions existed.   There was no medical testimony whatsoever to show that the spot was in or on the optic nerve.   On the contrary, several other doctors testified that the spot was neither in nor on the optic nerve, but again they were not experts in reading X-rays.   However, Dr. Grove, the only witness produced who was able to qualify as an expert reader of X-rays, positively testified that an examination of the X-ray plates disclosed that the dark spot was not anywhere near any part of the optic apparatus.   Dr. Paul's conclusions lost their evidentiary force as he testified that the spot seen in the X-rays could not have been the cause of plaintiff's condition unless the spot was in or on the optic nerve, a condition that did not exist according to the testimony.

There therefore appears to be no testimony showing that plaintiff's condition is due to the accident. The burden of proof was on plaintiff to establish his claim.   *Becker* v. *City of Detroit,* 267 Mich. 511; *Marman* v. *Detroit Edison Co.,* 268 Mich. 166.   This he did not do.

The award is set aside, with costs to defendant.

POTTER, C. J., and NELSON SHARPE, NORTH, FEAD, WIEST, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.